IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TRACY ALFARO,                          )
                                       )
                Plaintiff,             )
                                       )
        v.                             )   Case No.
                                       )   09-0312-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner        )
of Social Security,                    )
                                       )
                Defendant.             )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Tracy Alfaro seeks review of the final decision of
the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in (1) failing to find that plaintiff's obsessive-
compulsive disorder, post-traumatic stress disorder, and
personality disorder are severe impairments; (2) failing to
properly consider the testimony of plaintiff's counselor, Debra
Nash; and (3) finding that alcoholism and drug abuse are
contributing factors material to the determination of disability.
I find that the substantial evidence in the record as a whole
supports the ALJ's finding that plaintiff is not disabled.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On March 7, 2006, plaintiff applied for disability benefits alleging that she had been disabled since October 1, 2002. Plaintiff's disability stems from arthritis, major depressive disorder, obsessive compulsive disorder, and post-traumatic stress disorder.  Plaintiff's application was denied on June 15, 2006.  On August 21, 2008, a hearing was held before an Administrative Law Judge.  On September 19, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On March 17, 2009, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the

entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not

less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Com-
missioner.

5.   Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Aida Worthington, in addition to documentary evidence admitted at the hearing.

## A.   EARNINGS RECORD

The record establishes that plaintiff earned the following income from 1973 through 2008:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1973 | $     206.90 | 1991 | $ 9,506.21 |
| 1974 | 531.80 | 1992 | 14,059.28 |
| 1975 | 1,059.13 | 1993 | 845.82 |
| 1976 | 2,057.20 | 1994 | 12,225.77 |
| 1977 | 5,227.11 | 1995 | 16,971.24 |
| 1978 | 3,242.88 | 1996 | 19,858.04 |
| 1979 | 7,205.05 | 1997 | 20,703.42 |
| 1980 | 12,183.18 | 1998 | 20,727.54 |
| 1981 | 18,006.86 | 1999 | 21,209.82 |
| 1982 | 0.00 | 2000 | 22,030.09 |

| 1983 | 10,162.64 | 2001 | 22,593.82 |
|------|-----------|------|-----------|
| 1984 | 1,000.00 | 2002 | 21,860.05 |
| 1985 | 2,756.00 | 2003 | 366.43 |
| 1986 | 0.00 | 2004 | 522.50 |
| 1987 | 0.00 | 2005 | 0.00 |
| 1988 | 3,621.00 | 2006 | 0.00 |
| 1989 | 152.80 | 2007 | 2,471.99 |
| 1990 | 3,127.22 | 2008 | 0.00 |

(Tr. at 99, 101).

**B.    *SUMMARY OF MEDICAL RECORDS***

On April 11, 2000, plaintiff saw Byron Milgram, M.D. (Tr. at 174).

> [S]he has a son who had tried to commit suicide and had
> A.D.H.D., as well as a learning disability, bipolar disorder
> and borderline personality disorder. . . .  He was treated
> successfully and is now doing well.  It was after the home
> situation quieted down that she began to develop depressive
> symptoms of considerable intensity.  Many of those were
> taken care of in the hospital and she left the hospital on
> klonopin and zyprexa.  Zyprexa caused weight gain and
> swelling and she went of that and was placed on neurontin. .
> . .
>
> Her mental status examination did not indicate psychosis,
> but did indicate someone who is articulate, conscientious
> and moderately depressed. She was tearful for much of this
> session. She is not suicidal nor has she ever been. Her
> thought processes do not reveal any kind of distractedness
> or tendency toward or unusual thinking.  Her mood is
> depressed.

Dr. Milgram told plaintiff to start taking Paxil (anti-

depressant), to taper off the Neurontin (an anti-epileptic also

used to treat nerve pain), and to continue taking Klonopin

(treats anxiety). "I had received a very informative note from Maribeth King, M.S., L.P.C., who is seeing her in therapy. That therapy has had much positive benefit."

On April 26, 2000, plaintiff saw Dr. Milgram (Tr. at 175). Plaintiff was not responding after two weeks of Paxil, "but then that is not surprising since it may take a month. But considering the history, I assured her I did not think that medication was going to be the final answer since what seemed to be the most painful problem for her and what started out her depression was the fact that her husband had a mental illness, that is bipolar disorder, but betrayed the marriage by having an affair. She said, 'I never cried for two years after that.' That's true because she put her feelings on hold and they are stuck in her right now." He recommended she continue with therapy, and he prescribed Wellbutrin (antidepressant) to go along with the Paxil.

On May 17, 2000, plaintiff saw Dr. Milgram (Tr. at 176). "Apparently the medications that I put Ms. Alfaro on several weeks ago, have paid off. . . . The addition of Welbutrin [sic] SR 150 mg a day in the morning seems to keep her going and makes her more efficient and a lot more productive. People at work have said she smiles more. Interestingly enough, people in her life are the ones who are able to monitor her progress and give

her feed back, since she, herself, does not see, [sic] to be very sensitive to the positive changes. She describes, however, sort of running out of fuel emotionally and physically, in the evening, and this is whether it is on the week-end and she is at home all day, or whether she is at work, the same pattern exists. This will eliminate the home as being the depressive venue. Apparently it was the Welbutrin [sic] that lasts until sometime later in the day and therefore, on that basis, I increased the Welbutrim [sic] to 150 mg SR in the morning and asked her to take another 150 mg around 2:00 in the afternoon. She will call me in two weeks and if it works as well as I think it should, she will not have to return here and I will simply give her as much of the medication as she needs."

On August 18, 2000, plaintiff saw Dr. Milgram (Tr. at 177). Plaintiff had missed her last appointment and apologized. Dr. Milgram observed that plaintiff was depressed. She said she had not been going to work on time for the past week, she was very sleepy during the day. Although the combination Wellbutrin and Paxil brought her out of a depressive states earlier, she reported that as time went on she became more and more tired. Dr. Milgram believed it was a side effect of Paxil. He gave her instructions on how to taper off Paxil and started her on a low dose of Prozac (antidepressant). He told her to continue taking

the Klonopin and the Wellbutrin. "She will travel to Kentucky with her son for a trip in the next couple of weeks, but right after Labor Day she will be back here. I gave her samples from the office of Prozac."

On September 5, 2000, plaintiff saw Dr. Milgram (Tr. at 179). She complained that Paxil was making her sedated so she took herself off it. She then went on Prozac and was doing better with that. Plaintiff continued to feel weepy. Dr. Milgram increased plaintiff's Prozac to 40 mg a day along with the Wellbutrin and the Klonopin.

On August 28, 2001, plaintiff saw Dr. Milgram after not having seen him for the past year (Tr. at 178). Plaintiff indicated that she was doing well on Wellbutrin SR and Prozac for about eight or nine months. "[T]hen about three months ago she began, without any precipitants, to slip and to let things go, such as bills and her house, and got into debt. It seems that she was just overwhelmed by the smallest thing, plus her mood is down and she has crying spells that are spontaneous. She is not suicidal and, of course, she never was. Nothing has changed much at home, although she describes her husband as 'getting worse and he acts like a child.' Yet this is sort of a chronic condition in the home that hasn't got her down before as long as she was on medication. . . . She was somewhat tearful during the interview

and was yawning a great deal and apparently does not sleep well at night." Dr. Milgram continued plaintiff on Wellbutrin but believed the Prozac had lost its usefulness. He told her to stop taking Prozac and he prescribed Effexor (antidepressant).

On March 25, 2002, plaintiff called Dr Milgram after not having seen him since the previous summer (Tr. at 180). Plaintiff had felt well and stopped taking her Wellbutrin and Effexor. She got very depressed and thought of suicide although without a plan. She had all the classic symptoms of a severe Major Depression, and Dr. Milgram decided to hospitalize her.

Plaintiff was hospitalized at Baptist-Lutheran Medical Center from March 25, 2002, through March 27, 2002 (Tr. at 167-171). Her chief complaint was, "I stopped my medications." She had been off her medication since December 2001 and stated, "I just don't feel comfortable going back on my medications on an outpatient basis." Plaintiff denied any alcohol or drug use but said she was smoking under a pack of cigarettes per day. Plaintiff reported that she had been taking Effexor, Wellbutrin, and Klonopin which had been helping to keep her mood fairly stable and her anxiety under fairly good control until she stopped taking them.

During a physical exam at the time of admission, plaintiff had normal range of motion in all of her extremities with no

edema.

> MENTAL STATUS EXAM:  The patient was pleasant, polite,
> cooperative, and well groomed with good eye contact at the
> time of my evaluation.  She seemed to have slightly
> increased psychomotor activity, mostly [sic] likely related
> to the anxiety she was suffering from.  Her affect was
> somewhat restricted, anxious, and cheerful. . . .  Her
> memory seemed grossly intact.  Her insight and judgment were
> fair.

Plaintiff was started on Effexor-XR and Klonopin.  "The

patient tolerated these medications well and denied side effects.

The patient noted that she was feeling 'much better' with the

addition of the medication.  She also seemed very motivated with

treatment and seems very hopeful about the future and stated that

'I just really needed to get back on my medication and I know

that I can't stop them now.' . . .  Her affect was calmer,

brighter, and she seemed to have a much more positive attitude."

Plaintiff was assessed with major depressive disorder,

recurrent severe without psychotic symptoms, generalized anxiety

disorder, and rule out histrionic trait.  Her admitting GAF was

30,[1] and it was 50[2] upon discharge.

---

[1] A global assessment of functioning of 21 to 30 means
behavior is considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment
(e.g., sometimes incoherent, acts grossly inappropriately,
suicidal preoccupation) or inability to function in almost all
areas (e.g., stays in bed all day; no job, home, or friends).

[2] A global assessment of functioning of 41 to 50 means
serious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting) or any serious impairment in
social, occupational, or school functioning (e.g., no friends,

On April 2, 2002, plaintiff saw Dr. Milgram (Tr. at 181).

Ms. Alfaro, when last here, couldn't get suicide out of her
mind and was dissolved in tears and could hardly talk.  The
whole problem was that she stopped her antidepressant
because she was feeling 'well' and then began to come apart
within the next could of weeks to months.  This is actually
an old story with many people, but they usually don't get
quite this depressed.  She took my advice, went to the
hospital under the care of Dr. Young, who is covered by her
insurance, he kept her two days, put her on Effexor XR and
she responded almost immediately.  She is now taking 75 mg.
of the XR, I've increased that today to 112.5 mg. and in a
week it was be 150 mg.  She is doing so well, and she is
back to work now, that it won't be necessary for her to have
another appointment unless she has problems.  She will call
me within the next couple of weeks and give me a report.  At
[that] point I will know whether to keep the medicine the
way it is or to increase the dose.  She also takes Klonopin,
.5 mg. four times a day as needed, but at this time will be
much less of a need as she gets more Effexor.

October 1, 2002, is plaintiff's alleged onset date of

disability.  Plaintiff received no medical care during the six

months prior to her alleged onset date.

On October 18, 2002, plaintiff saw Dr. Milgram (Tr. at 182).

"Ms. Alfaro hasn't been here since April of this year.  She comes

here because she feels very depressed again.  She said she was

suspended from work for three days because she received

apparently some sort of pornographic e-mail and then passed it

over to another employee and spread it around.  That was called

by her company 'inappropriate' and that is why she was suspended.

Other then [sic] that, she has also been quite depressed, at

_____

unable to keep a job).

least she was tearful in the office telling me she can't concentrate, she loses her way when she goes places, she has to force herself to do things and basically has a Major Depression. She denies being suicidal at this point." Dr. Milgram increased plaintiff's Effexor and told her to come back in nine or ten days.

On October 28, 2002, plaintiff returned to see Dr. Milgram (Tr. at 183). She continued to be "quite depressed" and had no energy.

> She said she feels safe at home and doesn't feel that safe outside of the home. Some of the descriptions of her symptoms seem to be somewhat vague, but she feels vague. . . . I tried to probe for stresses and she mentions finances, but I couldn't get any precise idea of how badly her finances are affecting her. Right now her husband is earning the only income in the family. She dates her depression back to the time when her son tried to commit suicide when he was fifteen, four years ago. She related how she applied pressure and used a lot of her energy to get him the proper help against a system that apparently wasn't offering it. She won and at least for the time her son got more help. However, it seems, according to her, that all this came to naught now that he is eighteen years old, is involved in drugs and living with his father. I filled out a disability form for her. But it was difficult to do because the symptoms both objective and subjective were difficult to come by.

On November 8, 2002, plaintiff saw Dr. Milgram (Tr. at 184). He described her depression as "slowly but surely improving." She reported that she was not depressed the day before. Plaintiff continued to have trouble sleeping and was prescribed Restoril for that.

On November 22, 2002, plaintiff returned to see Dr. Milgram (Tr. at 185). Plaintiff was described as being "somewhat better with her depression". Dr. Milgram prescribed Buspar (treats anxiety), increased her Wellbutrin, and prescribed Remeron for sleep.

On December 6, 2002, plaintiff saw Dr. Milgram (Tr. at 186). Plaintiff reported that she is no longer afraid of going out of her home and into crowds, the spontaneous crying spells had stopped, and she felt sharper mentally. She reported some days of feeling lethargic, but she was having more good days than bad. Dr. Milgram kept plaintiff on the same medications.

On December 31, 2002, plaintiff returned to see Dr. Milgram (Tr. at 187). "Ms. Alfaro has improved considerably and is feeling quite well, although she still has some days when the depression still lingers. However, she has more energy and more optimism for the future." Dr. Milgram filled out a form indicating that he thought several more weeks off work would be appropriate.

There are no medical records covering the next year and ten months.

On October 11, 2004, plaintiff went to the emergency room due to chin swelling (Tr. at 211-212). Plaintiff was given Fentanyl (narcotic) with good pain relief followed by Ancef

(antibiotic) and Percocet (narcotic). She was discharged with a prescription for an antibiotic and Percocet.

On October 13, 2004, plaintiff was treated by Billy Irons, M.D., for a chin abscess (Tr. at 198-202, 209-210). She was smoking a half a pack of cigarettes per day. She had a "normal and pleasant mood and affect. Seems non-depressed at this time."

On December 6, 2004, plaintiff went to the emergency room for an infection on her face (Tr. at 207-208). She was admitted as oral antibiotics had not helped.

On December 8, 2004, plaintiff saw John Webb, M.D., for a consultative exam for a skin lesion (Tr. at 191-192). The records report that plaintiff was currently smoking 1/2 pack of cigarettes per day (Tr. at 195) and reported a 30-year history of smoking.

On January 25, 2005, plaintiff went to the emergency room complaining of suicidal ideation (Tr. at 205-206). She had been off her medications for the past year. Plaintiff's only physical complaint was a headache secondary to crying. Plaintiff continued to smoke cigarettes and reported a history of drug use in the remote past but none recently. Plaintiff was diagnosed with bipolar disorder and was transferred to Cushing Hospital in Leavenworth as that was the only place with space available.

Plaintiff was treated at Cushing Memorial Hospital from January 25, 2005, through January 27, 2005 (Tr. at 252-255). Plaintiff reported that she had been off her medications for the past three weeks and could not afford to get them filled. She said she did not know about the community resources which would help her get her medicine. She had been using methamphetamine and cocaine as a way to treat her depression, and she continued to smoke cigarettes. "She expressed frustration and shame when it was found that she was abusing methamphetamines and other substances. Patient is avoiding letting her husband know about this drug use. . . . She wanted to return back to her medications. . . . She seems to have appropriate plans for the future. No homicidal or suicidal ideations. Patient has no perceptual disturbances. . . . Patient had significant problems with medication use. She had started abusing stimulants as she was doing in the past. Patient was thus admitted". Plaintiff was restarted on her medications.

On February 3, 2005, plaintiff was seen at Samuel Rodgers Community Health Center complaining of depression since 1999 (Tr. at 242). She said her son lived with her and was "way out of control. He'd cut himself and lay out in the street." Plaintiff described her physical pain as a five and her emotional pain as a one. Plaintiff last used methamphetamine in January 2005, she

last used marijuana in January 2005, she last used alcohol in
January 2005.

On February 21, 2005, plaintiff failed to show for her
psychiatric appointment (Tr. at 241).

On March 21, 2005, plaintiff was seen by Michael Beteet, a
registered nurse, after complaining of arthritic pain for the
past two years, worse when going up and down stairs (Tr. at 227-
228). She had been using a brace and taking Mobic (non-steroidal
anti-inflammatory) both of which helped. "She is being treated
for anxiety with depression and is currently on Effexor
[antidepressant] 225 mg once a day and Xanax [treats anxiety]
p.r.n. [as needed]. She has no other known health problems." X-
rays of plaintiff's knee were taken. She was assessed with
depression with anxiety and degenerative joint disease of the
knee and shoulder. Plaintiff was continued on her same
medications.

On March 28, 2005, plaintiff referred herself for a
psychosocial assessment to deal with her depression and anxiety
(Tr. at 238). Shannon Johnston, MSW, LCSW noted that plaintiff
had scars on her arms and reported that she compulsively picks
her skin (Tr. at 238). She also reported that she hears whispers
and faint music, noting that she feels her house is haunted (Tr.
at 238). Plaintiff reported pain in her hands, neck, and knees,

as well as carpal tunnel syndrom and asthma (Tr. at 239).

Plaintiff reported that her mother died when plaintiff was 13. Afterward, plaintiff became involved with marijuana, LSD, and cocaine. Eventually she was sent to her grandparents' house where she was sexually molested by her grandfather.

Plaintiff was on her third marriage and had two children, ages 19 and 21. "[S]he fears she may be experiencing emptiness syndrome from the departure of her children." Plaintiff reported she had applied for disability but did not want it, preferring instead to work. She said she had worked for nine years as an administrative assistant but quit due to psychological problems and mood swings. Plaintiff reported a mood level of six.

Ms. Johnston observed that plaintiff displayed average to above average intelligence, her mood appeared euthymic,[3] her insight and judgment were good, and there was no evidence of a formal thought disorder. She assessed general anxiety disorder, major depressive disorder (mild, recurrent), borderline traits, and a GAF of 60.[4]

_____

[3]Pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated.

[4]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

On April 6, 2005, presented to Samuel U. Rodgers Health Center "because this is the first I have seen a doctor since January." (Tr. at 234-240). Portions of the record are as follows:

> HISTORY OF PRESENT ILLNESS: Patient says, "I was in inpatient in [a] psychiatric ward in January. I had no money for medicines. I have never been this down on finances in my life. I found I qualified for Medicaid. I was diagnosed [with] major depressive disorder six to seven years ago. When I do not take my medicines, it is bad. I went seven months without and manage[d] to hold on good till Thanksgiving. I cry all the time. I have always been in deep despair, when I am not on my medicines and I think of suicide every day. On the medicines I turned into a real person again. The Effexor used to work good, and seems to work now. I cry. It is normal crying when I get my feelings hurt and I do not even think of taking my life. The old doctor gave [me] Xanax. Now I have normal anxiety days. I still have Xanax left from 12/17/04. I do not take them often.

Plaintiff reported that her son was in the Army and her daughter was living in Grandview, so it was just her husband and herself at home. "I smoke too many cigarettes. Occasionally, I used marijuana." Plaintiff reported having been sexually abused by her grandfather as a child; and she said she was kidnaped, raped, and beaten when she was 15 years of age. "I got over it. When I am on medicines, I find positive things. Off of medicines I am sad all the time. . . . I missed my mother and cry about that and I could not function. I lost my job. Dr. Milgram was trying to adjust my medicines and I took a leave of absence and they said they would terminate me and I was fired after nine and

[a] half years."  Plaintiff reported that she would get nervous
and pick at any bumps on her skin.  The doctor observed many
scars on plaintiff's skin from past picking.

When asked about daily activities, plaintiff said she would
take her husband to work in the morning,[5] go home and clean up
the house, go see a movie at times, cook things for herself, and
go to the grocery store.  She said she attempted suicide once a
long time ago "because I was not back on medicines. . . .  I am
on medicines now and I do not think about it.  I am always in
pain and hurting and crying when I am off of medications."

Plaintiff was observed to be neat and casually dressed,
cooperative, spontaneous in giving information with good eye
contact.  "She does not present as delusional, but says 'I smell
things and occasionally I hear voices in my home.  I have been
told there is a presence.  They are friendly.  It is like hearing
someone talking often at [a] distance.  I cannot hear what they
are saying.  I smell things like perfume or fried chicken.  It
does not bother me.  This has not happened in two weeks.  I do
not talk to ghost[s] in public.'"

Plaintiff was diagnosed with major depressive disorder by
history, moderate; rule out post traumatic stress disorder; and
rule out borderline personality disorder with a guarded

---

[5]Earlier in the interview, plaintiff reported that her
husband is disabled with a mental disability (Tr. at 235).

prognosis. "She does not express any posttraumatic stress disorder symptoms; however, it is possible all this has some effect on her and her emotions. Also she has some personality features consistent with borderline personality disorder. She does pick at her skin in an obsessive-compulsive manner when she is very anxious. Her ego strength are [sic] weak and I get the impression she is having more problems with her relationship with her husband, although she does not seem to want to talk about this. I will keep her on medications she came to me on and she feels these medications are working well." Those medications were Effexor-XR (antidepressant), Wellbutrin SR (antidepressant), Trazodone (antidepressant) and Xanax (treats anxiety). No refills were given.

On April 11, 2005, plaintiff saw Ms. Johnston and reported financial struggles, communication problems with her husband, and insecurity about not having a high school education (Tr. at 241). She was educated about coping with stressors.

On April 25, 2005, plaintiff saw Ms. Johnston and worked on a plan to address her depression and anxiety.

On May 10, 2005, plaintiff failed to show for her psychiatric appointment (Tr. at 229, 248).

On May 23, 2005, plaintiff failed to show for her psychiatric appointment (Tr. at 229, 248).

On July 18, 2005, plaintiff failed to show for her psychiatric appointment (Tr. at 229, 248).

On June 8, 2005, plaintiff saw William Anderson, M.D., for cold symptoms (Tr. at 203-204).  Plaintiff continued to smoke cigarettes.  She was assessed with bronchitis.

On October 17, 2005, plaintiff was seen by Nancy Squire, M.D., to establish care (Tr. at 220-221).  Plaintiff complained of fatigue.  Dr. Squire ordered blood work and put plaintiff back on her medications - she had been off of them for a year due to lack of insurance.

On November 3, 2005, plaintiff saw Dr. Squire for a follow up on fatigue (Tr. at 218-219).  Plaintiff reported that she slept OK as long as she took her medication.  She was given a prescription for Trazodone.

On November 18, 2005, plaintiff failed to show for her psychiatric appointment (Tr. at 229).

On March 28, 2006, plaintiff recommenced treatment with therapist Shannon Johnston (Tr. at 245-248).  Plaintiff complained of severe depression and relationship issues with her husband.  Plaintiff had been off her medications for the past three months (Tr. at 247).  "I just need [to be] back on meds again."  Ms. Johnston assessed major depression disorder,

recurrent, severe, with a GAF of 50.[6]

On April 18, 2006, plaintiff saw Ms. Johnston and expressed frustration with her Medicaid denial (Tr. at 266). She had been attending a bipolar support group.

On April 25, 2006, plaintiff saw Ms. Johnston and reported an increased interest in arts and crafts, said she was less tearful and had more energy (Tr. at 266).

On May 4, 2006, plaintiff saw Ms. Johnston and shared her triggers leading to depression including guilt about not raising her children, problems in her marriage, and weather changes (Tr. at 266).

On May 9, 2006, plaintiff saw Ms. Johnston and complained of frustration with her husband's behavior (Tr. at 265, 329). She said she thought her husband was cheating on her and did not care for her anymore. She said she was feeling better and getting out more.

On June 6, 2006, Norman McCarthy, D.O., performed a disability evaluation at the request of Disability Determinations (Tr. at 289-292). Plaintiff stated that she was unable to work due to a mental disorder. "Examinee is very unclear as to how

---

[6]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

this mental disorder interferes with her performing any kind of job duties. Examinee further states that she has arthritis all over her body and that this just slows her down. She states her hands, shoulder, and feet all hurt. Once again, examinee was very vague as to how these really affect her performing any kind of job duties. Examinee did not mention any other complaints with regard to her performing any kind of physical activities." Plaintiff was smoking 1/2 pack of cigarettes per day and had for 37 years. "Drug use consists of using every possible drug that she could find which include[s] cocaine, Demerol, and morphine. She states she smoked marijuana for 20 years and continues to smoke marijuana when she can get it." Plaintiff had normal range of motion in her shoulders and elbows with normal grip strength and upper extremity strength. She had normal range of motion in her hips, ankles, cervical spine, and lumbar spine with normal lower extremity strength and negative straight leg raising. Dr. McCarthy assessed major depressive disorder (by history), arthritis (alleged and non-documented), asthma (by history), lesion of the right frontal lobe (alleged and non-documented), obesity, chronic drug use, and chronic tobacco use. "It must be medically noted that during this exam, there was no physiologic findings that would suggest any evidence of functional restrictions or physical impairments. It must be further noted

24

that the examinee is a pleasant, well-proportioned, obese, cleanly dressed female in no distress. She was alert, oriented to person, place, time and purpose. Her speech was rapid and clear and understandable. Her thought processes were logical. She had good eye contact. Her memory and [mental activity] were intact. Her mood was normal with normal range of affect."

On June 23, 2006, plaintiff told her counselor she was depressed over being turned down for disability benefits and being diagnosed with diabetes along with her husband having been wrongfully fired from his job (Tr. at 326).

On October 5, 2006, plaintiff and her counselor discussed coping with worry related to her son being deployed to Iraq (Tr. at 321).

On December 19, 2006, plaintiff told her counselor that she had been off her medication for the past two weeks (Tr. at 319). She described increased depression and skin picking and said she had attempted suicide within the past week. She was advised to go to the hospital.

On December 22, 2006, plaintiff was seen by Ashley Ferraro, D.O., complaining of upper respiratory infection symptoms (Tr. at 312). Plaintiff admitted to being a chronic smoker. She had multiple facial lesions secondary to being a "chronic picker." Plaintiff was assessed with acute bronchitis, given antibiotics,

and advised to stop smoking.

On December 28, 2006, plaintiff was seen at Samuel U. Rodgers Community Health Center "extremely distraught" and upset with the staff (Tr. at 318). She claimed that she wanted to hurt Dr. Edmisten. Hospitalization was recommended.

On December 30, 2006, plaintiff underwent a psychiatric evaluation by Bruno Zwerenz, M.D., after having made suicidal and homicidal statements (Tr. at 354-359). "In addition, the patient had been using methamphetamine and felt hopeless and helpless." Plaintiff reported that she was unemployed and had attempted to get Social Security disability but was denied. "She does use amphetamine and is bitter that people think her excoriated lesions are due to the amphetamine abuse. She indicates it is not that, I only use occasionally amphetamine because for a day or two it makes me feel not depressed. In addition, she has used marijuana but not lately." During the mental status exam, plaintiff "was accusatory toward Dr. Edmisten on a continued basis until she was asked to stop, since it would not lead to any results. She feels that he abandoned her, took hope away from her, did not care for her, and has many other accusations." On this day, plaintiff's GAF was 25.[7]

_____

[7]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately,

Plaintiff was admitted and went through inpatient treatment through January 5, 2007 (Tr. at 341, 345-347, 349, 348, 357, 359).[8]  On admission, her urine tested positive for amphetamine and marijuana (Tr. at 357).  She reported smoking a pack of cigarettes a day and had for 37 years (Tr. at 357).  Her son at was Bagdad at the time, in a "hot zone" (Tr. at 357).

> The patient is a 49-year-old female with history of mental illness and substance abuse.  She tends to minimize her drug addiction. She got admitted because she was having homicidal thoughts towards her psychiatrist because her psychiatrist took her off Xanax and tried the Klonopin for anxiety.  She has been using or abusing the Xanax for a number of years, and she got so upset with her psychiatrist.  At some point, she was having thoughts of killing him.  Today, she denies any homicidal thoughts towards anybody.  On admission, her urine drug screen was positive for amphetamine and cannabis. She really minimized her drug addiction.  She also has a history of picking on her skin.  There are scars, some old, some are fresh all over her both arms, forearm, and face. It looks like sometime we see those lesions in patients using amphetamine but she is aware of those, she was very defensive, she said that even when she is not using the amphetamine, she always picks on herself. . . .  She reports that she has been tried on so many anti-depressants including Zoloft, Paxil, Prozac, Wellbutrin, Celexa, and Effexor.  The only medicine that worked was Effexor.  She took it for 5 or 6 years, but lately it is not working.  She has also complained about difficulty sleeping at night. . . . She has not been going to the group activities. . . . She has been on Ativan [treats anxiety] now.  She is on on-schedule Ativan and also p.r.n. [as needed] Ativan.  So, I explained why we do not want her on Xanax and she was unhappy, but at least she understood.

---

suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[8]The records dated January 2, 2007, and January 5, 2007, are "1 of 2" however, I have been unable to find the second pages (Tr. at 341, 348).

She recently got upset with her psychiatrist because they
stopped her Xanax, then she started feeling more anxious,
irritable, and angry, and she reached to the point that she
was having thoughts of hurting or killing her psychiatrist.
She denies today any intention to harm herself or anybody
else.  She reports her anxiety symptoms are better, but
still she is very depressed.  Since she is on the unit, she
is not picking on her skin. . . .  [S]he realized tat now
she will not get the Xanax or Ativan on a regular basis
because we are going to treat her depression and anxiety
with antidepressant[s], and it was difficult for her to
accept that she will not be on Xanax, but she is okay for
now.  She tends to minimize her drug addiction.  She does
not appear to be motivated to go to inpatient or outpatient
rehab.

Plaintiff had fair eye contact, was very dramatic.  "Her

psychomotor activity is dramatic in nature.  Her mood is

depressed.  Affect is congruent.  Tearful at times, but however

they appeared to be cued at times.  Speech is normal rate and

tone.  Thought process is organized."  She was assessed with

depressive disorder not otherwise specified, obsessive-compulsive

disorder, and amphetamine abuse versus dependence.  She was

started of Seroquel (antipsychotic), Cymbalta (antidepressant)

and Zithromax (antibiotic), and her Trazodone was moved to

bedtime as needed for insomnia.

On January 29, 2007, plaintiff was seen at Samuel U. Rodgers

Community Health Center in "emotional crisis" because her husband

had left her (Tr. at 310).  She was given information about food

stamps, help with utilities, crisis line, legal aid, etc.

On February 5, 2007, plaintiff was seen at Samuel Rodgers Community Health Center (Tr. at 306). She admitted to doubling the Ativan dosage recommended. "∅ meds given to pt [patient] today." Plaintiff was also seen by a counselor that day (Tr. at 307-309). She was noted to be tearful initially but "cleared up quickly as conversation progressed." Plaintiff reported that her husband left her and was filing for divorce. She reported wanting to hurt Dr. Edmisten because he told her he did not know what more he could do for her and she did not want to hear that. Plaintiff thought some of her depression may have been related to her husband because after he left, she started feeling good at home alone. She was sleeping OK and had a stable appetite. The counselor later specifically asked about Dr. Edmisten, and plaintiff denied desires to harm him. She was quoted, "Sorry, I felt that way, usually a peaceful person." Plaintiff's third marriage had broken up and her divorce was pending.

On June 5, 2007, plaintiff was seen in the emergency room due to a laceration when she stepped on a piece of sharp metal (Tr. at 342-343). She reported a history of amphetamine abuse.

On September 7, 2007, plaintiff was seen in the emergency room for swelling on the back of her head (Tr. at 338-339, 344). She said she had a lesion on the back of her head from picking and she wanted an antibiotic for it. She said that about a week

earlier she was having a fight with her husband and was struck in the back of the head with a baseball bat. She denied loss of consciousness, did not have a headache, did not have any focal neurologic deficits, and had not sought medical treatment. The doctor assessed a possible early abscess.

On August 5, 2008, Debra Nash, L.P.N., completed a Mental Impairment Questionnaire at the request of plaintiff's attorney (Tr. at 334-337). Ms. Nash indicated that she had begun treating plaintiff about one year earlier and saw her about every other week. Plaintiff's current GAF was 50[9] with her highest GAF over the past year having been 55.[10] Ms. Nash found that plaintiff suffers from slight restriction of activities of daily living; moderate difficulties in maintaining social functioning; marked deficiencies of concentration, persistence, or pace; and repeated episodes of deterioration or decompensation in work or work-like settings. She listed "substantial drowsiness" as a side effect of medication, and wrote "fair" as to plaintiff's prognosis. She

_____

[9]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[10]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

checked, "yes" as to whether plaintiff's impairments result in good days and bad days, and she estimated that plaintiff would miss more than four days of work per month due to her symptoms and treatment. She indicated that plaintiff would have difficulty working a regular job on a sustained basis due to mood swings. Finally, when asked whether plaintiff's symptoms had been present since January 2002, Ms. Nash wrote, "unknown only started working [with] client 8/15/2007".

## C.   *SUMMARY OF TESTIMONY*

During the August 21, 2008, hearing, plaintiff testified; and Aida Worthington, a vocational expert, testified at the request of the ALJ.

## 1.   **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 51 years of age and is currently 53 (Tr. at 26). She was 5'8" tall and weighed about 250 pounds (Tr. at 26). Plaintiff lived alone (Tr. at 26-27).

Plaintiff has an 11th grade education (Tr. at 27). She has a valid driver's license (Tr. at 27).

Plaintiff last worked a few months before the administrative hearing (Tr. at 27-28). She worked 15 to 20 hours per week reading from catalogs and case files for blind teachers (Tr. at 28). She performed that job for almost a year and then was fired

(Tr. at 28).  She was told that she was not consistent -- that
one day she would get the orders right and the next day she would
not (Tr. at 29).  Plaintiff was paid $8.90 per hour (Tr. at 28).

Plaintiff is unable to work because she has trouble with her
emotions and she cannot sit still (Tr. at 29).  Plaintiff has
trouble getting up in the morning (Tr. at 30).  Although she has
her obsessive compulsive disorder "under control," she has a lot
of scars and "people don't like to look at that." (Tr. at 30,
34).  When plaintiff gets very stressed, her face breaks out and
she picks on it (Tr. at 35).  She used to pick her arms, and she
now has permanent scars (Tr. at 35).  She would pick at her arms
without realizing she was doing it (Tr. at 35).  With medication
and reminders from friends, she was able to break the habit (Tr.
at 35).  Plaintiff has to make notes or she forgets things, and
her medications make her feel "druggy" (Tr. at 30).

Plaintiff can bathe and dress, she can make food in the
microwave, and she can do dishes from time to time (Tr. at 30-
31).  She sleeps on the couch so she does not make her bed (Tr.
at 31).  She goes to the grocery store but brings a friend to
keep her focused (Tr. at 31).  Plaintiff goes out of her
apartment about twice a week to check the mail (Tr. at 32).  She
has a dog, but she waits until dark to take him out so she does
not have to talk to anyone (Tr. at 32).  Plaintiff does not drive

since she gave her up car (Tr. at 32).  She likes to take the bus and tell the bus driver where she needs to get off (Tr. at 32). Plaintiff wears headphones on the bus so that people will not talk to her (Tr. at 32).

Plaintiff has no energy (Tr. at 33).  She sometimes does not take her medicine because she is afraid she will not get up in the morning or because she has not eaten (Tr. at 33-34). Plaintiff has racing thoughts and she feels overwhelmed (Tr. at 34).

Plaintiff was asked what medications she takes for her psychological issues (Tr. at 37).  She responded, "I take three 75 milligram capsules of Effexor every morning.  I take 25 milligrams of Seroquel twice a day and 1 milligram of Klonopin twice a day and 150 milligrams of Seroquel at bedtime or an hour before I'm going to go to bed." (Tr. at 37).  Plaintiff takes her medication regularly now that she has Medicaid (Tr. at 37-38).

Plaintiff has arthritis, especially in her right knee (Tr. at 35).  She wears a brace a couple of times a month depending on her level of activity (Tr. at 35-36).  Plaintiff cannot grab a glass or a cup, and she has to use large pens to write (Tr. at 36).  She has trouble gripping, so she has to use both hands (Tr. at 36-37).  Plaintiff takes 800 milligrams of Ibuprofen twice a day for her arthritis (Tr. at 37).

Plaintiff previously used methamphetamine and cocaine but has not used those drugs for about two years (Tr. at 38). When asked if she was in treatment for her methamphetamine and cocaine use, plaintiff said, "No, sir, it wasn't a problem." (Tr. at 38). She explained that when she was not taking her medications, she would just want to feel good for a day and that was why she would use the street drugs (Tr. at 38). But now that she has her medication, she does not crave the street drugs (Tr. at 38-39).

## 2.  Vocational expert testimony.

Vocational expert Aida Worthington testified at the request of the Administrative Law Judge.

The first hypothetical included a person who could lift 20 pounds occasionally and ten pounds frequently; stand and walk for six hours per day; sit for six hours per day; should never climb ladders, ropes, and scaffolds; can occasionally climb stairs; should avoid concentrated exposure to hazardous machinery, unprotected heights, fumes, odors, dust, gasses, and poor ventilation; is limited to simple, routine, repetitive tasks; is limited to low-stress tasks which would permit only occasional decision making, changes in the work setting, and exercise of judgment; and could not perform production rate pace work. The person would be limited to only occasional interaction with the public, co-workers, and supervisors; and could have no

confrontational or negotiation type of contact (Tr. at 41-42).

The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 42). However, the person could work as a cutter/paster, D.O.T. 249.587-014 with 3,200,000 in the nation and 98,420 in Missouri; a phone collector, D.O.T. 211.462-038, with 3,500,000 in the nation and 2,015 in Missouri; or an addresser, D.O.T. 209.587-010, with 179,000 in the country and 4,680 in Missouri (Tr. at 42-43).

The vocational expert testified that an employee can miss about one day of work per month before the job is compromised (Tr. at 43). If a person had to miss more than two days per month every month, she would not be employable (Tr. at 44). If a person could not concentrate to the point where she could not complete tasks for a moderate amount of time (i.e., 2 1/2 hours per work day), then the person would not be employable (Tr. at 44).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge Jeffrey A. Hatfield entered his opinion on September 19, 2008 (Tr. at 11-16). The ALJ found that plaintiff's last insured date was June 30, 2008 (Tr. at 11).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12)

Step two.  Plaintiff suffers from the following severe impairments:  Arthritis, asthma, polysubstance abuse, and major depression (Tr. at 15).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12).

Step four.  Plaintiff has the residual functional capacity to occasionally lift 20 pounds, frequently lift ten pounds, stand and walk for six hours, and sit[11] for six hours (Tr. at 12).  She is unable to climb ladders or ropes; she may occasionally climb ramps and stairs; and she should avoid working at unprotected heights, around dangerous machinery, or with concentrated exposure to odors, fumes and poor ventilation (Tr. at 12-13).

The ALJ found that absent plaintiff's drug and alcohol abuse, plaintiff has mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. at 13).  Accordingly she can perform simple, repetitive tasks in a low-stress environment with occasional decision-making and changes in the work setting, with no production pace, occasional interaction with the general

_____

[11]The ALJ's order says "stand"; however, he had already listed a standing ability, he had not listed a sitting ability, and substituting the word "sit" here is consistent with the hypothetical question and with the ALJ's finding at page 15 that plaintiff can perform light work, which requires an ability to sit.

public and co-workers, and in a structured environment (Tr. at 13).

With this residual functional capacity, plaintiff cannot return to her past relevant work (Tr. at 14).

Step five.  Plaintiff can be a cutter/paster, a toll collector, or an addresser, all of which are available in significant numbers in the national and regional economies (Tr. at 14).

## VI.  SEVERE IMPAIRMENTS

Plaintiff argues that the ALJ erred in failing to find that plaintiff's obsessive-compulsive disorder, post-traumatic stress disorder, and personality disorder are severe impairments.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

(1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)  Capacities for seeing, hearing, and speaking;

(3)  Understanding, carrying out, and remembering simple instructions;

(4)  Use of judgment;

(5)  Responding appropriately to supervision, co-workers and usual work situations; and

(6)  Dealing with changes in a routine work setting.

## *Obsessive-Compulsive Disorder*

There is no evidence that plaintiff's obsessive-compulsive disorder, to the extent she has that disorder, significantly limits her ability to do basic work activities.  No doctor has ever diagnosed plaintiff with obsessive-compulsive disorder, although plaintiff has exhibited symptoms of the disorder by picking at sores.  However, the record establishes that plaintiff had problems with picking sores when she was off her prescribed medication (Tr. at 319).  In addition, her treating medical professionals have commented that the lesions observed on plaintiff are similar to those often observed on amphetamine users.

In addition to the above, plaintiff testified at the hearing that she has her obsessive-compulsive disorder under control (Tr. at 30, 34).  When asked whether she has any problems at all with

it, plaintiff said, "a little bit" (Tr. at 34-35). She also testified that she was able to "break the habit" of picking.

Based on the above, I find that the ALJ did not err in failing to consider obsessive-compulsive disorder a severe impairment.

*Post-Traumatic Stress Disorder*

No doctor has ever diagnosed plaintiff with post-traumatic stress disorder. Jack Edmisten, M.D., diagnosed "rule out post-traumatic stress disorder" on April 6, 2005, and his notes state that plaintiff "does not express any posttraumatic stress disorder symptoms".

*Personality Disorder*

Although plaintiff argues the ALJ erred in not finding a personality disorder a severe impairment, she offers no argument or specific citations to the record on this disorder. Dr. Edmisten, in April 2005, noted that plaintiff had some personality features consistent with borderline personality disorder; however, he assessed only "rule out borderline personality disorder." He also noted his belief that plaintiff's condition was related to problems she was having with her husband -- problems she did not want to talk about.

The records also show that plaintiff's psychiatric symptoms improved with medication. See Brown v. Barnhart, 390 F.3d 535,

540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). The medical sources noted that plaintiff's mood and symptoms improved when she was compliant with treatment (Tr. at 168, 178, 181, 187). Plaintiff admitted that her medications helped her and that her condition deteriorated when she was not compliant (Tr. at 39, 167, 180-81, 234, 319). In addition, plaintiff failed to show up for several appointments during the relevant time period (Tr. at 229, 248, 326, 329). See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) ("The ALJ paid particular attention to the fact that Eichelberger cancelled several physical therapy appointments . . . ."). Plaintiff was not interested in treatment for her drug abuse, and her doctors noted that she minimized her drug problem. See Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999) (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)). There is no evidence that plaintiff's noncompliance was caused by financial limitations. In fact, she was advised by medical personnel that community sources were available for her medications (Tr. at 253). See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) ("However, there is no evidence Goff was ever denied medical treatment due to financial reasons."). During the period when she did not follow her treatment, she continued to smoke

cigarettes, drink alcohol, and use methamphetamine and marijuana
(Tr. at 170, 203, 205, 209, 234, 239-40 242, 253-55, 290, 312,
340, 345-46, 348, 353, 355-57, 360).  See Riggins v. Apfel, 177
F.3d 689 (8th Cir. 1999) ("Although Riggins claims he could not
afford such medication, evidence to suggest that he sought any
treatment offered to indigents or chose to forgo smoking three
packs of cigarettes a day to help finance pain medication.").

The evidence in the record establishes that plaintiff's
ability to perform basic work activities was not limited by
obsessive-compulsive disorder, post-traumatic stress disorder, or
borderline personality disorder.  There is no evidence that these
conditions (if indeed she suffered from them) interfered with her
ability to walk; stand; sit; lift; push; pull; reach; handle;
carry; see; hear; speak; understand, carry out, or remember
simple instructions; use judgment; respond appropriately to
supervision, co-workers, and usual work situations; or deal with
changes in a routine work setting.

Based on the above, I find that the ALJ did not err in
finding plaintiff's obsessive-compulsive disorder, post-traumatic
stress disorder, or borderline personality disorder to be severe
impairments.

## VII. CREDIBILITY OF PLAINTIFF'S COUNSELOR

Plaintiff argues that the ALJ erred in failing to properly consider the testimony of plaintiff's counselor, Debra Nash.

On August 9, 2006, the Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). The ruling clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources." SSA separates information sources into two main groups: "acceptable medical sources" and "other sources." It then divides "other sources" into two groups: medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007). Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

1. Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment. Id.

2. Only acceptable medical sources can provide medical opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3. Only acceptable medical sources can be considered treating sources. 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p. <u>Sloan v. Astrue</u>, 499 F.3d 883, 888 (8th Cir. 2007). "Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." <u>Id</u>. quoting SSR 06-3p.

The courts have consistently criticized the Social Security Administration for failing to discuss third-party statements:

> Where proof of a disability depends substantially upon subjective evidence, as in this case, a credibility determination is a critical factor in the Secretary's decision. Thus, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." <u>Tieniber v.</u>

<u>Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983). <u>See also</u>
<u>Andrews v. Schweiker</u>, 680 F.2d 559, 561 (8th Cir. 1982). In
this case, the administrative law judge was, of course, free
to disbelieve the testimony of Basinger, his wife, and the
affidavits of others. <u>Isom v. Schweiker</u>, 711 F.2d 88, 89-90
(8th Cir. 1983); <u>Simonson v. Schweiker</u>, 699 F.2d 426, 429
(8th Cir. 1983). This, however, the administrative law
judge did not do. Rather, the administrative law judge
denied disability benefits based on the lack of objective
medical evidence.

Basinger should not have his claim denied simply because he
failed to see a physician near the time that his insured
status expired. The testimony indicated that Basinger had
rarely sought medical attention throughout his lifetime.
Indeed, his wife stated that she did not believe that
Basinger had ever been to a doctor until 1968. She
explained Basinger's failure to see a doctor between 1973
and 1980 as owing partly to stubbornness, and partly to
finances. A Social Security claimant should not be
disfavored because he cannot afford or is not accustomed to
seeking medical care on a regular basis. The failure to
seek medical attention may, however, be considered by the
administrative law judge in determining the claimant's
credibility.

The error in this case was the failure of the administrative
law judge to give adequate consideration to the objective
testimony presented by the two physicians and the subjective
testimony and affidavits of Basinger, his wife, and others.
We do not decide the question of whether this evidence was
sufficient to prove that Basinger was disabled within the
insured period. Before that determination is made, the
administrative law judge must judge the credibility of the
witnesses. If all of Basinger's evidence is to be given
credence, we believe that Basinger has at least met his
initial burden of showing that he could not return to his
former employment. We reverse the decision of the district
court and remand this case to the Secretary for further
consideration of Basinger's claim. On remand, the
administrative law judge should consider all of the relevant
objective and subjective evidence presented by the claimant,
and if any of the evidence is to be discredited, a specific
finding to that effect should be made.

<u>Basinger v. Heckler</u>, 725 F.2d 1166, 1170 (8th Cir. 1984).

However, the fact that the courts have made this criticism on a regular basis does not mean that in every case the failure of an ALJ to analyze the credibility of third-party witnesses remand is automatic. For example, in Young v. Apfel, 221 F.3d 1065 (8th Cir. 2000), the court held that the ALJ "implicitly" evaluated the testimony of the claimant and her witnesses by evaluating the inconsistencies between her statements and the medical evidence.

> [B]ecause the same evidence also supports discounting the testimony of Young's husband, the ALJ's failure to give specific reasons for disregarding his testimony is inconsequential. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (arguable failure of ALJ specifically to discredit witness has no bearing on outcome when witness's testimony is discredited by same evidence that proves claimant's testimony not credible). Finally, we find that the ALJ did not discredit the statements of Young's friends merely on the grounds that they were not medical evidence; rather, the ALJ observed that the statements were devoid of specific information that could contradict the medical evidence regarding Young's capabilities during the relevant time period.

Id. at 1068-1069.

See also Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Bates v. Chater, 54 F.3d 529, 533 (8th Cir. 1995).

The opinion at issue is the August 5, 2008, Mental Impairment Questionnaire completed by Debra Nash, L.P.N., at the request of plaintiff's attorney (Tr. at 334-337). Ms. Nash indicated that she had begun treating plaintiff about one year earlier and saw her about every other week. Plaintiff's current

45

GAF was 50 with her highest GAF over the past year having been
55.  Ms. Nash found that plaintiff suffers from slight
restriction of activities of daily living; moderate difficulties
in maintaining social functioning; marked deficiencies of
concentration, persistence, or pace; and repeated episodes of
deterioration or decompensation in work or work-like settings.
She listed "substantial drowsiness" as a side effect of
medication, and wrote "fair" as to plaintiff's prognosis.  She
checked, "yes" as to whether plaintiff's impairments result in
good days and bad days, and she estimated that plaintiff would
miss more than four days of work per month due to her symptoms
and treatment.  She indicated that plaintiff wold have difficulty
working a regular job on a sustained basis due to mood swings.
Ms. Nash wrote that plaintiff suffers from a residual disease
process that has resulted in such marginal adjustment that even a
minimal increase in mental demands or change in the environment
would cause her to decompensate (Tr. at 335).  She indicated that
all of her opinions were independent of alcoholism or drug
addiction (Tr. at 334).  Finally, when asked whether plaintiff's
symptoms had been present since January 2002, Ms. Nash wrote,
"unknown only started working [with] client 8/15/2007".

The ALJ gave no weight to the opinion of plaintiff's
counselor, Debra Nash:

> Debra K. Nash, the claimant's counselor, completed a Mental Impairment Questionnaire on August 5, 2008. She noted that she first saw the claimant on February 5, 2007. She diagnosed major depressive disorder, recurrent, moderate obsessive compulsive disorder and post-traumatic stress disorder. She assessed a GAF of 50. . . . I give no weight to the most generous assessment of Debra Nash because she is not a medical doctor.

(Tr. at 13).

The ALJ's "analysis" of Ms. Nash's opinion was part of his determination of whether plaintiff suffered from a severe impairment. He determined that plaintiff's "main problem [was] her drug/alcohol addiction" and recounted plaintiff's history of improvement when she took her prescribed medication and deterioration when she stopped her prescribed medication and/or used illegal drugs and alcohol, and the opinion of a medical doctor which contradicted the opinion of Ms. Nash who is not a doctor.

"Although specific articulation of credibility findings is preferable, we consider the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (citing Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (ALJ did not specifically outline reasons for rejecting testimony, but clear from record the ALJ made certain implicit determinations regarding credibility)).

Ms. Nash's opinion is not supported by the medical records and is inconsistent with the record as a whole. She indicated that plaintiff had "marked" deficiencies in concentration, persistence, and pace, and had a poor memory[12] (Tr. at 334-35). However, this is inconsistent with the treatment records of Jack Edmisten, M.D., plaintiff's treating psychiatrist, who is an acceptable medical source. See 20 C.F.R. § 404.1513. During the course of plaintiff's treatment, Dr. Edmisten repeatedly noted that her memory and cognitive abilities remained intact (Tr. at 168, 230, 233, 247, 322-25, 327-28). Dr. McCarthy also found normal cognitive abilities (Tr. 292).

Ms. Nash stated that plaintiff's affect was blunt, flat, or inappropriate, which is contradicted by Dr. Edmisten's treatment records (Tr. at 230, 233, 247, 322-25 327-28, 334). Ms. Nash claimed that plaintiff's medication caused substantial drowsiness (Tr. at 336); however, there is no medical record showing that plaintiff complained of drowsiness. See Depover v. Barnhart, 349

---

[12]I note also that on August 21, 2008 -- about two weeks after Ms. Nash's assessment -- plaintiff testified at the administrative hearing and was able to recount all of her medications and dosages without difficulty: "I take three 75 milligram capsules of Effexor every morning. I take 25 milligrams of Seroquel twice a day and 1 milligram of Klonopin twice a day and 150 milligrams of Seroquel at bedtime or an hour before I'm going o go to bed. . . . And then I take 800 milligrams of Ibuprofen twice a day for my arthritis." (Tr. at 37). This type of testimony is not indicative of a poor memory, which is how Ms. Nash described plaintiff.

F.3d 563, 566 (8th Cir. 2003) ("We also think that it was
reasonable for the ALJ to consider the fact that no medical
records during this time period mention Mr. Depover having side
effects from any medication.").

Ms. Nash believed that plaintiff was not a malinger;
however, there is no indication that Ms. Nash ever performed any
psychological testing to determine whether plaintiff was or
was not a malinger (Tr. at 336).  Ms. Nash's opinion relies in
part on plaintiff's subjective complaints which were found not
credible by the ALJ (a finding not challenged by plaintiff in
this federal appeal).  See Kirby v. Astrue, 500 F.3d 705, 709
(8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr.
Harry's opinion, because it was based largely on Kirby's
subjective complaints rather than on objective medical
evidence.").

Ms. Nash's opinion is also internally inconsistent.  She
believes that plaintiff had "marked" deficiencies in
concentration, persistence, and pace but was capable of handling
her own finances (Tr. at 336-37).  See Guilliams v. Barnhart, 393
F.3d 798, 803 (8th Cir. 2005) ("opinions that are internally
inconsistent, however, are entitled to less deference than they
would receive in the absence of inconsistencies.").

Despite being advised to include all relevant treatment records to support the assessment, Ms. Nash did not include any medical records (Tr. at 334). Although Ms. Nash indicates she saw plaintiff approximately every other week for a year, plaintiff did not present any records from treatment with Ms. Nash.[13] Therefore, it is unknown whether Ms. Nash was aware of plaintiff's poor compliance with treatment recommendations by her doctors, or the fact that plaintiff's condition improved whenever she was in compliance. It is also unknown whether Ms. Nash was aware of plaintiff's illegal drug use.[14] See Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008) ("In light of Owen's failure to attend his physical therapy appointments, stop smoking, and follow regular exercise and dietary plans, the ALJ did not err in considering Dr. Paulsrud's failure to account for Owen's noncompliance.").

A conclusory statement of disability based on plaintiff's subjective complaints is entitled to little weight when

---

[13]It is the plaintiff's responsibility to provide medical evidence to show that she is disabled. 20 C.F.R. § 404.1512. (2009); Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) ("[T]he claimant's failure to provide medical evidence with [work-related restrictions] should not be held against the ALJ when there is medical evidence that supports the ALJ's decision.").

[14]Ms. Nash's opinion states that it is independent of limitations caused by plaintiff's polysubstance abuse; however, such a statement would have much less impact if one were to discover that Ms. Nash was unaware of any drug use by plaintiff.

unsupported by objective medical evidence.  See Brown v. Chater,
87 F.3d 963, 964-65 (8th Cir. 1996); Holmstrom v. Massanari, 270
F.3d 715, 721 (8th Cir. 2001).  Because Ms. Nash is not an
acceptable medical source, the ALJ did not err in giving no
weight to her opinion during his discussion on whether plaintiff
suffered from a severe impairment.  "Information from these
'other sources' cannot establish the existence of a medically
determinable impairment," according to SSR 06-3p.  Sloan v.
Astrue, 499 F.3d 883, 888 (8th Cir. 2007).  "Instead, there must
be evidence from an 'acceptable medical source' for this
purpose."  Id. quoting SSR 06-3p.  Although information from
plaintiff's counselor may be used to determine the severity of
plaintiff's impairment and how it affects the her ability to
function, the problems outlined above warrant the ALJ's decision
to give no weight to Ms. Nash's opinion.

## VIII. EFFECT OF PLAINTIFF'S ALCOHOLISM/DRUG ADDICTION

Finally, plaintiff argues that the ALJ erred in finding that
plaintiff's drug addiction and alcohol use were contributing
factors material to the determination of disability.

Plaintiff bears the burden of proving that her substance
abuse was not a contributing factor material to the alleged
disability.  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir.
2002), citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir.

2000).

Alcoholism and drug addiction are no longer a basis for obtaining Social Security benefits. Pub. L. No. 104-121, 110 Stat. 852-56 (1996). "An individual shall not be considered disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. 423(d)(2)(C), 42 U.S.C. 1382c(a)(3)(J). The claimant has the burden of proving that alcoholism or drug addiction is not a contributing factor. Kluesner v. Astrue, 607 F.3d 533, 537 (8th Cir. 2010); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). "If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow." Kluesner v. Astrue, 607 at 537 quoting Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). That is, in the matter of a tie, the claimant wins. Id.

In the case of alcoholism and drug addiction, an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability. Kluesner v. Astrue, 607 F.3d at 537; Brueggemann v. Barnhart, 348 F.3d at 694; 20 C.F.R. §§ 404.1535(a) and 416.935. If the ALJ finds a disability and

evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of the substance abuse. <u>Kluesner v. Astrue</u>, 607 F.3d at 537; <u>Brueggemann v. Barnhart</u>, 348 F.3d at 694-95.

In this case, the record clearly establishes that plaintiff's mental impairments are caused by her illegal drug use and her noncompliance with medical treatment.

In March 2002, plaintiff reported that she had been feeling well on her medication but then had stopped taking it and became depressed resulting in hospitalization. She reported that her medications had kept her anxiety under control and her mood stable until she stopped taking the medications.

October 2002 plaintiff was described as being vague about her depressive symptoms and could only name finances as a stressor. Plaintiff's treating doctor, Dr. Milgram, filled out a disability form for plaintiff but found it difficult to do because her symptoms "both objective and subjective were difficult to come by."

In December 2002, plaintiff was taking her prescribed medications and was feeling good. Plaintiff received no mental health treatment for the next two years.

At the end of January 2005, plaintiff sought mental health treatment for suicidal ideation after having been off her

medications for the past year.  She reported having used illegal drugs in the past "but none recently."  She was admitted, and she reported at the hospital that she had been off her medications for only three weeks.  She then admitted to having used methamphetamine and marijuana as a way to treat her depression and claimed she had not had the money to buy her prescription medications.  It is not clear whether plaintiff initially admitted to drug use, as the records indicate it was "discovered" that plaintiff had been using these illegal drugs, implying that testing in the hospital initially uncovered her drug use.  In February 2005, she admitted that she had used methamphetamine, marijuana, and alcohol the previous month.

In April 2005, plaintiff told her doctor, "When I do not take my medicines, it is bad.  I went seven months without and manage[d] to hold on good till Thanksgiving.  I cry all the time. I have always been in deep despair, when I am not on my medicines and I think of suicide every day.  On the medicines I turned into a real person again.  The Effexor used to work good, and seems to work now."

On October 17, 2005, plaintiff told Dr. Squire she had been off her medications for the past year.

In November 2005, plaintiff told Dr. Squire that she slept fine as long as she was taking her medications.

In March 2006, plaintiff complained of severe depression and noted that she had been off her medications for the past three months.

In June 2006, Dr. McCarthy noted that plaintiff was "very unclear as to how this mental disorder interferes with her performing any kind of job duties." Dr. McCarthy wrote, "Drug use consists of using every possible drug that she could find which include[s] cocaine, Demerol, and morphine. She states she smoked marijuana for 20 years and continues to smoke marijuana when she can get it." Dr. McCarthy performed an exam and found as follows: "It must be medically noted that during this exam, there was [sic] no physiologic findings that would suggest any evidence of functional restrictions or physical impairments. It must be further noted that the examinee is a pleasant, well-proportioned, obese, cleanly dressed female in no distress. She was alert, oriented to person, place, time and purpose. Her speech was rapid and clear and understandable. Her thought processes were logical. She had good eye contact. Her memory and [mental activity] were intact. Her mood was normal with normal range of affect."

In December 2006, plaintiff noted she had been off her medication for several weeks and had noted increased depression. At the end of that month, hospitalization was recommended; and it

was discovered that plaintiff had again been using methamphetamine. Although she denied having used marijuana, her urine tested positive for marijuana along with amphetamine. Plaintiff was hospitalized this time because of threats she made toward her doctor who took her off Xanax (anti-anxiety medication), which she was noted to have been abusing, and putting her on an antidepressant instead. During her hospitalization the beginning of January 2007, she was started on antidepressants, and it was observed that she was no longer picking her skin.

In February 2007, plaintiff admitted to having doubled her dosage of Ativan (anti-anxiety medication).

There are no records of mental health treatment from February 2007 through August 2008 when plaintiff's counselor completed a Mental Impairment Questionnaire in connection with plaintiff's disability case.

The record does not establish any difficulty with mental health symptoms when plaintiff abstained from using illegal drugs and took her prescribed medication as directed. Therefore, plaintiff has failed to meet her burden of establishing that her illegal drug use was not a contributing factor material to her otherwise-acknowledged disability.

**IX. CONCLUSIONS**

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 16, 2010